# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BLUMFIELD INVESTMENTS, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>   v.<br><br>WORLD HEALTH ALTERNATIVES, INC., RICHARD E. McDONALD; MARC D. ROUP, JOHN C. SERCU, and DASZKAL BOLTON LLP,<br><br>               Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br><u>**Electronically filed**</u> |

Plaintiff, by its undersigned attorneys, for its Class Action Complaint alleges, upon personal knowledge as to himself and its own acts, and upon information and belief based, *inter alia*, on the investigation conducted by its attorneys and their staffs, including reviews and analyses of public filings with the Securities and Exchange Commission, securities analyst and debt rating agency reports, press releases, news articles, and other media reports, as to all other matters, as follows:

## <u>NATURE OF THE ACTION</u>

1.     This is a securities class action on behalf of public investors who purchased the common stock of World Health Alternatives, Inc. ("WHAI," or the "Company") between June 26, 2003 and August 18, 2005, both dates inclusive (the "Class Period").  Named as defendants are World Health Alternatives, Inc., Richard E. McDonald, Marc D. Roup, John C. Sercu, and Daszkal Bolton LLP.  The case involves a manipulation of financial statements in which, among

other acts of deception, defendants knowingly or recklessly misrepresented the Company's earnings and artificially inflated the Company's stock price by improper accounting practices.

2.      During the Class Period, Defendants issued, or caused to be issued, false and misleading statements during the Class Period to artificially inflate the value of WHAI stock. Through Defendants' false and misleading statements, the Company were able to mislead investors as to the number of outstanding shares the Company had, manipulated financial statement recognition of a convertible debenture and warrant agreement, underpaid certain tax liabilities in excess of $4 million, and obtained an additional $6.5 million in funding from its lenders that was excess to its loan agreements by submitting irregular reports to the Company's lenders.  As a result, the Company has terminated its outside auditor, Daszkal Bolton LLP, retained outside counsel and the Board of Directors has retained special counsel to assist it with its investigation.  Further, the Company has determined that it will be restating its prior financial statements and has warned investors not to rely on the information contained therein.  Thus, Company's reported earnings statements for the interim periods were inflated in violation of Generally Accepted Accounting Principles ("GAAP").

3.      GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in accordance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X also requires that interim financial statements comply with GAAP.  17 C.F.R § 210.10-01 (a).

4.      On the last trading day before the announcement, the price of WHAI common

-2-

stock closed at $1.85 per share. Following the announcement, the price of WHAI common stock fell to 49 cents per share, a loss of approximately 73% of the value of the stock from the previous trading day.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa, and 28 U.S.C. §1331.

6.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission (the "SEC"), 17 C.F.R. 240.10b-5.

7.  Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and ©). The principal executive offices of WHAI are located in this District, the defendants transact business in this District, and many of the acts and transactions constituting the violations of law alleged herein, including the preparation, issuance, and dissemination of materially false and misleading statements to the investing public, occurred in this District.

8.  In connection with the acts, conduct and other wrongs alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

## THE PARTIES

### Plaintiff

9.  Plaintiff Blumfield Investments purchased 43,000 shares of WHAI common stock

Case 2:05-cv-01366-TMH   Document 1   Filed 09/29/05   Page 4 of 35

during the Class Period, as represented in its attached Certification, and was damaged thereby.

**Defendants**

      A.      **The Corporate Defendant**

10.     Defendant WHAI is a Florida corporation with its executive offices and principal place of business located in this District at 777 Penn Center Blvd., Suite 111, Pittsburgh, PA 15235.

11.     Defendant WHAI and its wholly owned subsidiaries provide medical, professional, and administrative staffing services to the healthcare industry in the United States. The Company's staffing business primarily comprises nurse staffing, which includes registered nurses, licensed practical nurses, and certified nurse's aides, allied health staffing, and physician staffing. It also provides support services staffing and information technology staffing for clients in the healthcare industry and other industries. The Company primarily offers its staffing services to acute care hospitals, including community hospitals, teaching institutions and trauma centers, private physicians' practices, surgical and ambulatory care centers, nursing homes, pharmacies, medical clinics, and insurance companies located in or near metropolitan areas.

      B.      **The Individual Defendants**

12.     Defendant Richard E. McDonald ("McDonald") served, at all relevant times, until his resignation on August 16, 2005, as the Company's Chairman of the Board and President. He also served as Chief Executive Officer from June 23, 2004 until his resignation on August 16, 2005. He also formerly served as the Chief Financial Officer of the Company, and continued to list himself as the Principal Accounting Officer.

13.     Defendant Marc D. Roup ("Roup") was, until his resignation on June 23, 2004,

-4-

the Company's Chief Executive Officer and Director.

14.    Defendant John C. Sercu ("Sercu") served as the Company's Chief Operating

Officer since May 2004 until he succeeded McDonald as Interim Chief Executive Officer and

Acting President.

15.    Defendants Richard E. McDonald, Marc D. Roup, and John C. Sercu are

collectively referred to herein as the Individual Defendants.  As officers, directors, and

controlling shareholders of the Company, the Individual Defendants are controlling persons of

the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their

positions with the Company and with WHAI, they were able to and did, directly or indirectly, in

whole or in material part, control the content of public statements issued by or on behalf of the

Company.  They participated in and approved the issuance of such statements made throughout

the Class Period, including the materially false and misleading statements identified herein.

16.    By reason of their positions with the Company, the Individual Defendants had

access to internal Company and WHAI documents, reports and other information, including the

adverse non-public information concerning the Company's services, financial condition, and

future prospects, and attended management and/or board of directors meetings.  As a result of the

foregoing, they were responsible for the truthfulness and accuracy of the Company's public

reports and releases described herein.

17.    It is appropriate to treat the Individual Defendants as a group for pleading

purposes and to presume that the false, misleading and incomplete information conveyed in the

Company's public filings, press releases and other publications, as alleged herein, are the

collective actions of the narrowly defined group of defendants identified above.  Each of the

above officers and/or directors of WHAI, by virtue of their high level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or deliberately disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

###    C.    <u>Auditor Defendant</u>

18.    Daszkal Bolton LLP ("Daszkal") served as the Company's independent outside auditor at all relevant times. Daszkal Bolton LLP is a limited liability partnership based in Florida, with offices in Boca Raton and West Palm Beach. In that connection, Daszkal issued audit reports on the Company's publicly filed annual financial statements certifying: (1) that it had audited WHAI's financial statements in accordance with generally accepted auditing standards ("GAAS"); (2) that it had planned and performed its audits "to obtain reasonable assurance about whether the financial statements are free of material misstatements"; (3) that, in its opinion, WHAI's financial statements "present fairly, in all material respects, the financial position" of WHAI in conformity with generally accepted accounting principles ("GAAP"); and (4) that its audits provided "a reasonable basis for [its] opinions."

### <u>PLAINTIFF'S CLASS ALLEGATIONS</u>

19.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of

Case 2:05-cv-02366-TMH   Document 1   Filed 09/29/2005   Page 7 of 35

the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased common stock of WHAI between June 26, 2003 and August 18, 2005 (both dates inclusive), and were damaged thereby ("the Class"). Excluded from the Class are defendants herein, officers and directors of WHAI, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

20. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to the plaintiff at this time and can only be ascertained through appropriate discovery, the plaintiff believes there are, at a minimum, thousands of members of the Class who purchased WHAI common stock during the Class Period. The Company has over 40 million shares of its common stock outstanding and trades on the Over-The-Counter-Bulletin-Board and under the symbol "WHAIE."

21. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by defendants' acts as alleged herein;

b) whether WHAI issued false and misleading financial statements during the Class Period;

c) whether the Individual Defendants caused WHAI to issue false and misleading financial statements during the Class Period;

d) whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e) whether the market prices of WHAI securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

-7-

Case 2:05-cv-02066-TMH   Document 1   Filed 09/29/2005   Page 8 of 35

f)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

22.     Plaintiff's claims are typical of the claims of the members of the Class as plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

23.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

24.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

25.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a)      defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b)      the omissions and misrepresentations were material;

c)      the securities of the Company traded in an efficient market;

d)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e)      plaintiff and members of the Class purchased their WHAI stock between the time the defendants failed to disclose or

misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

26.     Based upon the foregoing, plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## BACKGROUND

27.     The Company has grown largely through acquisitions.  On February 20, 2003, WHAI announced that it had acquired 100% of the common stock of Better Solutions, Inc. ("Better Solutions"), a healthcare staffing company, from its founders and co-owners, defendants McDonald and Roup.  In exchange, WHAI provided defendants McDonald and Roup with 33,000,000 shares, or approximately 82% of newly issued shares of WHAI common stock.  As a result, Better Solutions became a wholly subsidiary of WHAI, and McDonald and Roup became the controlling shareholders of WHAI.

28.     As of March 31, 2003, WHAI had assets totaling $245,727 and negative shareholder equity of $91,762.  Sales for the three months ended March 31, 2003 totaled $942,887, and the Company reported a net loss of $395,016, or $.01 per share.

**The False and Misleading Statements**

29.     On June 26, 2003, WHAI announced that its common stock has begun trading on the OTC Bulletin Board.

30.     On July 1, 2003, the Company issued a press release to provide guidance as to its 2003 earnings per share, in which Defendant McDonald stated:

> Our revenues are up 33% so far this year from revenues over the same period last year, and our new offices in Cleveland and Boca Raton are beginning to produce positive results after only 6 months of operation.

-9-

In 2001 and 2002, we produced earnings per share of 6 cents and 7 cents, respectively.  Based on these trends and using the same earnings per share percentages, we could hit 15 to 18 cents earnings per share by the end of this year.  Opening additional corporate offices and selling franchises should also increase our revenues.

. . . .

One of the great things about BSI is that it was profitable long before it was acquired by World Health. BSI's business and expansion plans demonstrate its continued commitment to improving its financial performance.  Simply put, our business, which matches qualified medical personnel to a client's existing needs, is unique because we don't have inventories and we never have to make an investment in personnel without some return.  'Projects then people' has been, and will remain, a guiding approach to running the medical staffing business.

31.     On July 8, 2003, the Company issued a press release entitled "World Health Alternatives, Inc.'s MedTech Division Achieves All-time Sales Record for June with Closing of New Contracts," which stated, in pertinent part:

World Health Alternatives, Inc.'s MedTech Division, which provides medical staffing services to the healthcare industry, has acquired key contracts with an estimated yearly value of $1.3 million that should positively affect World Health's revenues in 2003 and beyond.

32.     On August 13, 2003, the Company issued a press release entitled "World Health Alternatives, Inc., Announces Increased Sales and Profits in Second Quarter 2003; Company Anticipates Stronger 2nd Half," which stated, in pertinent part:

The Company reported that sales for the quarter increased by 25% to $842,000 from the $674,000 recorded during the three months ended June 30, 2002.

. . . .

For the three months ended June 30, 2003, gross profit was up 41% to $332,000 compared with $236,000 in the same period the prior year.  The increase is due to the higher revenues and additional permanent placement fees received in the current quarter.  As a percentage of sales, gross profit increased 4.5% to 39.5% for the

three months ended June 30, 2003 from 35.0% for the three months
ended June 30, 2002, and is attributable in part to additional
permanent placement fees received in the current quarter.

Defendant McDonald added:

Our quarter-and half-year results show that the Company will reach
our earlier earnings target for fiscal year 2003 of $0.15 per share.
The expansion of our business to Ohio and to Florida has already
proved its worth by adding to our top line growth. We expect this to
continue as they bring World Health Alternative's services to their
markets.
. . . .

Looking ahead, we anticipate signing our first franchise contract
before the year's end, and we are also actively pursuing acquisition
opportunities. Our typical acquisition target has revenues of $2-3
million, operating in a single city with existing contracts in the six-
month to one-year range.
. . . .

We anticipate our second-half results will be stronger than the figures
we're reporting today. The improvement seen thus far comes from
increased marketing efforts, our ability to provide our clients with
faster service, and our ability to maintain what we consider to be the
best talent pools in the markets we serve. As a result, we have won
staffing contracts with large clients in those markets.

33.     On August 13, 2003, the Company filed its quarterly report with the SEC on Form

10-QSB for the quarter ended June 30, 2003. The Company's Form 10-QSB was signed and

certified by Defendants McDonald and Roup and reaffirmed the Company's previously announced

financial results.

34.     On September 4, 2003, the Company issued a press release entitled "WHAI US:

Expects Record Breaking Quarter." In the press release, Defendant McDonald stated:

The results for the quarter so far, and the extrapolations we are
making from those, show that we are on track to break records.

For the quarter ending September 30, 2003, we expect an increase in

revenues from hourly consulting services to be approximately 31%, and a 70% increase in permanent fees and conversion fees (payments made to World Health Alternatives when a consultant is hired full-time by the client) versus the third quarter of 2002. We further anticipate that the current quarter will beat the revenue record of our previous best quarter by 8%.

We are on target for an approximate 18% increase in gross profit in the third quarter of 2003 over the same period in the year before, which is about 3% better than the nest quarter in the history of the Company. Net profit could more than double in the quarter ending September 30, 2003, compared with the same period last year.

35.     On October 29, 2003, the Company filed its quarterly report with the SEC on Form 10-QSB for the quarter ended September 30, 2003. The Company's Form 10-QSB was signed and certified by Defendants McDonald and Roup and reaffirmed the Company's previously stated financial results.

36.     On October 30, 2003, the Company issued a press release entitled "World Health Alternatives, Inc. Announces 38% Higher Sales in Third Quarter," which stated:

Sales for the third quarter of 2003 climbed 38% to $946,000 from $686,000 in sales for the same period in 2002.
. . . .

Gross profit for 2003's third quarter reached $460,000, which is approximately 113% higher than the $217,000 for 2002's third quarter. As a percentage of sales, gross profit stood at 48.7% in third quarter 2003, 17.2% higher than the 31.5% seen in third quarter 2002. The increases are due to the significant increase in contract business received during the year, additional permanent placement fees received in the latest quarter, and an overall increase in the margin on the Company's staffing contracts.

Operating income increased to $186,000 for the third quarter of 2003, up from $326 in the same period prior year. The higher result is attributable to a combination of the Company's increased revenues and gross margins and management's recent cost containment efforts.

Defendant McDonald added:

> We anticipate that the fourth quarter will continue the up trend in
> sales and earnings.  And we expect that the results from the fourth
> quarter of 2003 will not only exceed the results from the last quarter
> of last year, but they will likely also beat the results we have just
> reported.

Defendant Roup also concluded:

> The stronger permanent placement fees are a significant development
> for our Company, and we expect them to continue to contribute to our
> overall financial health.  During the third quarter, long-term contracts
> and growth in new markets and our traditional base markets increased
> our sales and earnings. This has been our strategy all along.

37.    On March 25, 2004, the Company issued a press release entitled "World Health

Alternatives, Inc. Announces Record Fourth Quarter and 2003 Results," which stated:

> The Company's sales for the fourth quarter were $962,000, which
> was a 19% increase over the fourth quarter sales in 2002 of $809,000.
> Gross profits for the fourth quarter of 2003 rose to $490,000, an
> increase of 49% over the fourth quarter of 2002.  As a percentage of
> sales, gross profit for the fourth quarter reached 50.9%, which was
> 10.2% higher than the 40.7% realized in the fourth quarter of 2002.
> The increase primarily resulted from significant increases in contract
> placements of staffing personnel, more favorable margins on those
> placements, and a rise in permanent placement fees during the fourth
> quarter.
>
> Operating income more than doubled to $296,000 in the fourth
> quarter of 2003, up from $113,000 in the fourth quarter of 2002.  This
> 162% increase is attributable to a combination of increased revenues
> and margins and a decrease of 11% in selling, marketing and
> administrative expenses in the fourth quarter that resulted from cost
> containment measures.
>
> Net income was $226,000 in the fourth quarter of 2003 as compared
> to $95,000 for the prior quarter, representing an increase of 138%.
> Earnings per share for the fourth quarter were $0.01 on a weighted
> average of 34,918,990 shares. However, as a result of previously
> announced transactions pursuant to which the Company redeemed
> shares from certain executive officers of the Company, the number
> of shares currently outstanding is 23,738,243.
> . . . .

-13-

> Sales climbed 32% to $3,693,000 for the year ended 2003 versus $2,797,000 in sales for the same period in 2002.
> . . . .
>
> Gross profit for the year ended 2003 reached approximately $1,600,000, which is 58% higher than the total in 2002 of $1,015,000.  As a percentage of sales, gross profit rose to 43.3% in 2003, representing a 7% increase over 36.3% realized in 2002.

Defendant McDonald stated:

> I am proud of the record showing we made in the fourth quarter of 2003, and particularly pleased that we were able to complete our first acquisition.  The combination of Superior's $5,508,000 in annualized revenues in 2003 and our $3,693,000 in revenues in that year would make us one of the largest specialized medical staffing companies in Western Pennsylvania.

Defendant Roup added:

> We performed well in 2003 considering the significant total amount of one-time expenses that we incurred during the year in an effort to position the Company to maximize its future profits and growth potential.  The absence of these expenses in 2004, the size of our business now that Superior Staffing is a part of it, and our strong performance in the fourth quarter all point to a bright 2004.

38.     On April 20, 2004, the Company filed its annual report with the SEC on Form 10-KSB for the year ended December 31, 2003.  The Company's Form 10-KSB was signed and certified by Defendants McDonald and Roup and reaffirmed the Company's previously announced financial results.

39.     On May 17, 2004, the Company issued a press release entitled "World Health Alternatives, Inc. Announces First Quarter Financial Results; Sales and Gross Profits Soar As Operating Loss Narrows," which stated:

> Sales for the quarter ended March 31, 2004 reached $1.68 million, up 78% from $943,000 for the same period in 2003.  Management credits the increase to the sales made by Superior Staffing Solutions,

-14-

Inc., which World Health acquired in December 2003.

Gross profit for the quarter ended March 31, 2004 more than doubled to $665,000, compared to $317,000 for the same quarter in 2003. The increase in gross profits resulted from additional permanent placement fees received in the first quarter of this year as well as from additional fees attributable to the Superior Staffing acquisition.

40.     On May 17, 2004, the Company filed its quarterly report with the SEC on Form 10-QSB for the quarter ended March 31, 2004. The Company's Form 10-QSB was signed and certified by Defendants McDonald and Roup and reaffirmed the Company's previously announced financial results.

41.     On August 16, 2004, the Company issued a press release entitled "World Health Alternatives, Inc. Announces Record Second Quarter and Half-Year Financial Results," which stated:

Actual sales for the Company for the quarter ended June 30, 2004, reached approximately $5.6 million, up 560% from $842,000 for the same period in 2003. The increase was primarily due to the three acquisitions, which were Pulse Healthcare Staffing, Inc. in May 2004, Care For Them, Inc. in May 2004 and Curley and Associates, LLC in June 2004. The Company was able to achieve this increase in sales even though the treatment under GAAP of the effective date for each acquisition meant that the Company could not incorporate the acquisitions' revenues until after the second quarter was partially completed.

Gross profit for the quarter ended June 30, 2004, hit approximately $1.75 million, which was an increase of 427% when compared to $332,000 for the same quarter in 2003. The Company attributes this growth to the acquisitions as well as strong margins produced by the core business.

Defendant McDonald added:

Our top-line growth has been substantial and our margins have remained strong. This is mainly attributable to the Company's success at executing its strategic business plans, which included

-15-

raising capital and acquiring three medical staffing companies located in Massachusetts, California and Florida.

Following General Accepted Accounting Principles ("GAAP"), the Company was able to incorporate and benefit from the acquisitions' revenues for only a fraction of the second quarter.
. . . .

If we assume, on a pro forma basis, that the three business acquisitions in the second quarter of 2004 had been consummated on January 1, 2004, the Company estimates it would have realized sales of $23.8 million in the first half of 2004 versus $18.6 million in the first half of 2003. We also estimate that we would have realized pro forma income of $275,461 for the first half of 2004 versus a loss of $2,610,375 for the first half of 2003, and pro forma earnings before deductions for interest, depreciation, amortization and taxes for the six months ended June 30, 2004 of $2,021,492 or $0.07 per share.

Based on the progress World Health has made in integrating its acquisitions and in growing its business organically, I am comfortable projecting third quarter 2004 revenue of $13 million to $17 million and earnings of 6 to 8 cents per fully diluted share.

42.     On August 23, 2004, the Company filed its quarterly report with the SEC on Form 10-QSB for the quarter ended June 30, 2004. The Company's Form 10-QSB was signed and certified by Defendants McDonald and Roup and reaffirmed the Company's previously announced financial results.

43.     On October 22, 2004, the Company filed a Form 8-K with the SEC, which stated:

Effective October 22, 2004, World Health Alternatives, Inc. closed on a financing transaction with a group of private investors ("Investors") of up to $11,825,000. The financing consisted of two components: (a) up to $11,825,000 Principal Amount of the Debentures, of which $5,400,000 has been delivered and (b) Warrants registered in the name of each Investor to purchase up to a number of shares of Common Stock equal to 25% of such Investor's Subscription Amount divided by the Closing Price on October 22, 2004, with an exercise price of 105% of the average of the Company's five Closing Prices for the five Business Days prior to October 22, 2004.

-16-

The Company has the sole right for the first 120 days to redeem the debenture for cash only with no issuance of equity. The shares of Common Stock underlying the securities sold in this financing transaction will be registered for resale on a Registration Statement to be filed by the Company if such shares are to be issued in accordance with the agreements and the Company has not converted the debenture for cash during the first 120 days. The terms and conditions of such registration are described in the transaction documents and in certain Registration Rights Agreements.

44.     On November 22, 2004, the Company issued a press release entitled "Soars to New Highs in Revenues, EBITDA and Gross Profits in Third Quarter and Nine Month Financial Results," which stated:

Sales for the Company for the three month period ended September 30, 2004 reached $10,543,872, up 1015% from $945,761 for the same three month period ended September 30, 2003. The increase was primarily due to the Company's organic growth and the acquisitions it completed between December 2003 and June 2004. The Company's October 14, 2004 acquisition, Travel Nurse Solutions, Inc., achieved approximately $5 million in sales in its third quarter ended September 30, 2004. The pro forma combined revenue for both World Health and Travel Nurse Solutions for the third quarter was approximately $15.5 million.

Gross profit for the three month period ended September 30, 2004, reached approximately $3,746,828, or 35.5%, which was an increase of 714% when compared to $460,491 for the same quarter in 2003. The Company attributes this growth to the acquisitions as well as strong margins produced by the core business. It can also attributed to the recent increase in cross selling between multiple product lines and geographic areas. Travel Nurse Solutions' gross profit in the third quarter was $1,317,564.

Defendant McDonald added:

Our top-line growth has climbed substantially for the second quarter in a row, enabling us to achieve, in a short period of time, a position as one of the top ten specialized medical staffing companies in the country. Since the last time reporting, we have successfully completed two more acquisitions, which we expect to add approximately $109 million to the Company's revenues over the next

-17-

fiscal year.  We have also reduced our overall debt and improved our balance sheet.  We believe that our growth has contributed to the consistent rise in our stock price over the past 5 quarters, which, in turn, has resulted in a number of warrant and debt holders converting their positions during the third quarter.

. . . .

In light of the two acquisitions we completed since the end of the third quarter, the recent reduction of our debt and debt service obligations, and our intent to continue seeking out accretive acquisition candidates, we believe we will increase profitability and surpass $200 million in revenue over the 2005 fiscal year.

45.    On November 22, 2004, the Company filed its quarterly report with the SEC on Form 10-QSB for the quarter ended September 30, 2004.  The Company's Form 10-QSB was signed and certified by Defendants McDonald and reaffirmed the Company's previously announced financial results.

46.    On January 20, 2005, the Company issued a press release entitled "World Health Alternatives, Inc.'s Earnings Guidance for 2005 Ranges from $0.50 to $0.55 Net Per Share on $200 Million in Revenues," which stated that the Company:

expects the fourth quarter for the fiscal year ended December 31, 2004, to be its strongest yet.  The Company anticipates that its fourth quarter revenues for all businesses on a pro forma basis (meaning the Company is treating the acquisition transactions initiated in the fourth quarter as if they had been completed at the start of the quarter) will be approximately $30 million, and expects to achieve a 12% profit on those revenues at the operating level.  Additionally, World Health indicates that it expects to record revenues during 2005 of at least $200 million.  There can be no assurances that the projected net per share earnings or revenues in 2005 will be achieved.

Defendant McDonald added:

On the $200 million in revenue that we expect to achieve in 2005, we anticipate achieving a 34% gross profit margin on billable services. That gross profit margin would be an increase over the gross profit margin that the Company's combined operating divisions had at the

-18-

end of the fourth quarter of 2004, which was approximately 32%.
We also expect to improve our net margins by 1% or 2% through
additional efficiencies and improved utilization of shared resources.
The Company plans to use the cash generated from profits to
continue its acquisition and organic growth strategy. Overall, we are
pleased with the Company's overall financial and operating position
at this time and believe that we are well positioned to take full
advantage of the profit generating can be given that the Company will
achieve the estimated revenue for 2005 of that such revenue will
generate the expected excess cash or gross profit margin.

Defendant Sercu concluded:

> We are now in the second phase of our integration plan for many of
> the offices we acquired in 2004. Having integrated their existing
> business operations into World Health in the first phase of the plan,
> we are now expanding those business operations by establishing new
> and complementary operating divisions at those offices. Our
> successful growth is a testament to the strong management and
> staffing teams we have been building and training over the last 6
> months. We are able to achieve higher production and profit with the
> same number of people, which demonstrates our ability to achieve
> greater results in this business as we hit critical mass and can
> capitalize on economies of scale.

47.    On March 29, 2005, the Company issued a press release entitled "World Health

Alternatives, Inc. Reports Results for Fourth Quarter and Year Ended December 31, 2004," which

stated:

> •    Fourth Quarter Sales Increase 114% Versus Third Quarters Sales
>
> •    All World Health Companies Combined Produced $36.5 Million
>      in 4th Quarter Revenues On Pro Forma Basis
>
> •    Company Refinanced and Consolidated Outstanding Debt in
>      February 2005, Cutting Cost of Capital
>
> •    Company Expects First Quarter 2005 Earnings of $0.08 to $0.10
>      Per Share on Revenues of $39 Million to $42 Million
>
> . . . .
>
> Gross Profit fro the three month period ended December 31, 2004,

-19-

reached $3,928,592, which was an increase of 802% when compared to $489,712 for the fourth quarter in 2003.  The Company attributes this growth to the acquisitions as well as strong organic growth achieved through the addition of new business units in existing offices.  The three aforementioned fourth quarter acquisitions had a combined pre-acquisition gross profit in the fourth quarter of approximately $7.9 million or 22%.

Defendant McDonald added:

> The Company achieved critical mass in the fourth quarter, substantially through strategic acquisitions and strong organic growth.  We now offer all of the product line that are integral to staffing the healthcare industry, making us a 'one-stop' staffing solution for an entire healthcare system.  We have established a national reach and expect the benefits to include additional clients contracts, a deeper talent pool of consultants and stronger financial performance.  We have also reduced our overall debt and improved our financial and operating position.

> Since our last reporting period, we have successfully completed three more acquisitions, which we expect to add approximately $131 million to the Company's revenues over the 2005 fiscal year. Furthermore, the Company has continued to experience a strong organic growth rate, reaching 8% for the second quarter in a row on a quarter over quarter basis.  We believe that rate will increase to 11% in the first quarter and continue to remain in double digits throughout reducing the number of internal employees from 329 to 296, which we expect will save approximately $1.4 million in personnel costs throughout 2005.  The first quarter of 2005 has also yielded excellent results so far and put us on schedule to meet our goals for the year.  We expect our first quarter earnings to be $.08 to $.10 per share on revenues of $39 million to $42 million.  Overall, we believe we are well-positioned to meet the increasing demand for healthcare staffing services that the Company has been experiencing and we iterate our guidance for 2005 of $200 million in revenues and $.50 to $.55 in net earnings.

> The Company expects to report a corresponding non-cash, beneficial increase in earnings in the first quarter of 2005 as a result of having incurred in the fourth quarter of 2004 certain non-cash expenses associated with preferred stock transactions recognized in the fourth quarter.

-20-

48.     On April 15, 2005, the Company filed its annual report with the SEC on Form 10-KSB for the year ended December 31, 2004.  The Company's Form 10-KSB was signed and certified by Defendants McDonald and reaffirmed the Company's previously announced financial results.  This filing was thereafter amended on May 16, 2005 with the filing of a Form 10-KSB/A. The Form-KSB/A contained the statements:

> The Registrant's total revenue for the fiscal year ended December 31, 2004 was $40,339,739. The aggregate market value of the voting stock held by non-affiliates of the registrant was $119,854,215 as of March 31, 2005, computed on the basis of the average of the bid and asked prices on such date. As of March 31, 2005, there were 46,259,950 shares of the registrant's Common Stock outstanding.

49.     The Form 10-KSB also contained a report prepared and signed by Defendant Daszkal Bolton which stated:

> Report of Independent Registered Public Accounting Firm To the Board of Directors and Stockholders World Health Alternatives, Inc. We have audited the accompanying consolidated balance sheets of World Health Alternatives, Inc. as of December 31, 2004 and 2003, and the related consolidated statements of operations, changes in shareholders' equity (deficit) and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.
>
> Except as discussed in the following paragraph, we conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.
>
> The Company is currently in consultation with members of the Office

of the Chief Accountant of the Securities and Exchange Commission (SEC) regarding the application of Emerging Issues Task Force 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock* , and Financial Accounting Standards Board Statement No. 133 *Accounting for Derivative Instruments and Hedging Activities* to the redemption and conversion features of the preferred stock issued in December 2004. The financial statements for the fiscal year ended December 31, 2004 ("2004 financial statements") reflect the classification of these features of the preferred stock as embedded derivatives as more fully discussed in Note 2. Resolution of the accounting treatment discussion between the Company and the SEC may result in a restatement of the 2004 financial statements.

In our opinion, except for the effects on the 2004 financial statements of such adjustments, if any, as might be determined to be necessary depending on the resolution of the accounting treatment discussed in the preceding paragraph, the financial statements referred to in the first paragraph above present fairly, in all material respects, the financial position of World Health Alternatives, Inc. at December 2004 and 2003, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

50.     On May 12, 2005, the Company issued a press release entitled "World Health Alternatives, Inc. Reports Record Revenue of $40.5 Million in First Quarter 2005; Company Reiterates Guidance for 2005: Revenue of Approximately $200 Million; EPS $0.50-$0.55." which stated:

- First Quarter Revenues Increased 11% Versus Fourth Quarter 2004 Revenues Due to Organic Growth

- All Divisions Combined Produced $40.5 Million in First Quarter Revenues

- Company Produced $4.6 million in Earnings Before Interest, Depreciation and Amortization

- Gross Margins Improved to 28.4% of First Quarter Revenue

- Net Margins Hit 8.9% and Sales, Marketing and Administrative

Expenses Decreased to 19.3% of Revenue.

Defendant McDonald added:

> In the fourth quarter of 2004, we achieved critical mass through our fourth quarter of 2004, we achieved critical mass through our strategic acquisition initiative, which included closing our most recent acquisition on December 31, 2004. As evidenced by our profits in the first quarter of 2005, we are utilizing our highly motivated sales force and the ability to generate cash and strong organic growth to move forward with the next step in our business plan. We believe the first quarter is only an indication of what we can achieve in the future. In fact, we plan to continue capitalizing on efficiencies within our organization and strengthening the Company's overall operations. Although the medical staffing industry has experienced a challenging environment over the past year, we have shown that the strategic mix of staffing products we offer the medical community and the high level of attention we provide to our skilled medical staff in the field can build a long-term future for World Health and our investors, employees and clients.

51. The statements referenced above were each materially false and/or misleading when made because they failed to disclose the following material adverse facts which were then know to Defendants or recklessly disregarded by them for the following reasons: (1) Defendants misstated the amount of its outstanding shares; (2) Defendants failed to properly account for convertible debenture and warrant agreements associated with the Company's preferred stock; (3) Defendants failed to properly pay tax liabilities in excess of $4 million; and (4) Defendants misled Company's lenders which resulted in $6.5 million in excess funding under the loan agreements enhancing the Company's operations

**The Revelations**

52. Prior to the market opening on August 16, 2005, WHAI issued a press release entitled "World Health Alternatives Announces the Resignation of CEO Richard McDonald and the Appointment of John Sercu as Interim CEO," which sated:

-23-

> World Health Alternatives, Inc., a premier human resource firm offering specialized healthcare personnel for staffing and consulting needs in the healthcare industry, announced today that Mr. Richard E. McDonald has resigned from his position as the Company's President and Chief Executive Officer. Mr. McDonald indicated that he was resigning for health and family reasons.
>
> The Company's Board of Directors has appointed Mr. John Sercu, the Company's Chief Operating Officer, as its interim President and Chief Executive Officer. Mr. Sercu has been responsible for formulating and executing the Company's business strategies and overseeing its daily operations since joining the Company as COO in May 2004.
>
> The Company also announced that it will file with the Securities and Exchange Commission (the "SEC") a Form 12b-25, notifying the SEC that the Company's quarterly report on Form 10-QSB for the period ending June 30, 2005, which was due to be filed on August 15, 2005, could not be filed within the prescribed time period. The date on which the Company will release its second quarter financial results and host the associated conference call and webcast will be announced at a future date.

53. One August 19, 2005, the Company issued a press release announcing "that it was taking action to suspend trading as a result of certain issues that have come to light following the recent departure of its chief executive officer, Richard E. McDonald. The company is commencing an independent investigation and his hired independent counsel."

54. One August 19, 2005, after the market closed, the Company issued a second press release entitled "World Health Alternatives, Inc. Commences Investigation," which stated:

> World Health Alternatives, Inc. announced today that, following the recent departure of former Chief Executive Officer, Richard E. McDonald, the Company is investigating issues that include, but may not be limited to, apparent discrepancies in the amount of the Company's shares outstanding, financial statement recognition of a convertible debenture and warrant agreement associated with the Company's preferred stock, the underpayment of certain tax liabilities in excess of $4 million, and irregular reports to the Company's lenders that resulted in excess funding under the

-24-

Company's lending agreements of approximately $6.5 million, in addition to other issues which may constitute breaches of existing financing documents.

The Company has retained outside counsel, and the Board of Directors has retained special counsel to conduct an investigation into the discrepancies. The amounts at issue could change as the investigation continues. Since the Company's stock is traded on the OTC Bulletin Board, the Company does not have the authority to suspend trading of its stock.

The Company has also terminated its engagement with Daszkal Bolton LLP, its outside auditing firm, and will begin a search for a new auditing firm. It is expected that the Company's prior financial reports will be restated. The Company is actively working with its short-term cash obligations. John Sercu, the interim Chief Executive Officer of the Company, stated, "It is very unfortunate to have discovered that we have to deal with these issues, but management and the Board are working diligently to resolve them. The Company continues to make staffing placements of its medical and other professionals on a daily basis with its clients, and we look forward to continuing our business into the future.

55.     The market reacted swiftly to the Company's revelations, as WHAI's stock plummeted 73% or $1.36, on usually high trading volume of over 32 million shares, from its closing price of $1.85 on August 18, 2005, to close at 49 cents on August 19, 2005.

## CLAIMS FOR RELIEF

### COUNT I

(Against All Defendants For Violations of
Section 10(b) And Rule 10b-5 Promulgated Thereunder)

56.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

57.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

-25-

58.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (a) artificially inflate and maintain the market price of WHAI common stock; (b) enhance the value of their personal holdings of WHAI securities; ©) reap enormous profits from the exercise of their stock options and the sale of WHAI securities; and (d) cause plaintiff and the other members of the Class to purchase WHAI common stock at inflated prices.

59.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for WHAI common stock.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about WHAI's finances and business prospects.

60.     By virtue of their positions at the Company, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such

facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

61.  Defendants were motivated to make the enumerated false statements and omit material information necessary to make the statements not misleading as part of their plan to conceal the Company's inability to pay down its debt.

62.  Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the the sale of WHAI common stock from their personal portfolios.

63.  Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and directors of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs.

64.  The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of WHAI common stock was artificially inflated throughout the Class Period. In ignorance of the

adverse facts concerning WHAI's business and financial condition which were concealed by defendants, plaintiff and the other members of the Class purchased WHAI common stock at artificially inflated prices and relied upon the price of the stock, the integrity of the market for the stock and/or upon statements disseminated by defendants and were damaged thereby.

65.     During the Class Period, WHAI common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of WHAI common stock at prices artificially inflated by defendants' wrongful conduct. Had plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid. At the time of the purchases by plaintiff and the Class, the true value of WHAI stock was substantially lower than the prices paid by plaintiff and the other members of the Class. The market price of WHAI common stock declined sharply upon public disclosure of the facts alleged in this complaint.

66.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10-5 promulgated thereunder.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

67.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68.     (a)     During the Class Period, defendant Richard E. McDonald participated in the

operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of WHAI's business affairs.  Because of McDonald's  senior positions, he knew the adverse non-public information about WHAI's inflated revenues and false financial statements.

(b)     As an officer and director of a publicly owned company, McDonald had a duty to disseminate accurate and truthful information with respect to WHAI's financial condition and results of operations, and to correct promptly any public statements issued by WHAI which had become materially false or misleading.

©)     Because of his positions of control and authority as a senior officer and director of WHAI, McDonald was able to, and did, control the contents of the various reports, press releases and public filings which WHAI disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, McDonald exercised his power and authority to cause WHAI to engage in the wrongful acts complained herein. McDonald, therefore, was a "controlling person" of WHAI within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of WHAI common stock.

69.     (a)     During the Class Period, defendant Marc D. Roup participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of WHAI's business affairs.  Because of Roup's senior positions, he knew the adverse non-public information about WHAI's inflated revenues and false financial statements.

(b)     As an officer and director of a publicly owned company, Roup had a duty to disseminate accurate and truthful information with respect to WHAI's financial condition and results of operations, and to correct promptly any public statements issued by WHAI which had become

materially false or misleading.

©)      Because of his positions of control and authority as a senior officer of WHAI, Roup was able to, and did, control the contents of the various reports, press releases and public filings which WHAI disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, Roup exercised his power and authority to cause WHAI to engage in the wrongful acts complained herein.  Roup, therefore, was a "controlling person" of WHAI within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of WHAI common stock.

70.      (a)      During the Class Period, defendant John C. Sercu participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of WHAI's business affairs.  Because of Sercu's senior position, he knew the adverse non-public information about WHAI's inflated revenues and false financial statements.

(b)      As an officer and director of a publicly owned company, Sercu had a duty to disseminate accurate and truthful information with respect to WHAI's financial condition and results of operations, and to correct promptly any public statements issued by WHAI which had become materially false or misleading.

©)      Because of his position of control and authority as a senior officer of WHAI, Sercu was able to, and did, control the contents of the various reports, press releases and public filings which WHAI disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, Sercu exercised his power and authority to cause WHAI to engage in the wrongful acts complained herein. Sercu, therefore, was

a "controlling person" of WHAI within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of WHAI common stock.

71.     Each of the Individual Defendants, therefore, acted as a controlling person of WHAI. By reason of their senior management positions and directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which plaintiff and the other members of the Class complain.

72.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20 of the Exchange Act for the violations of WHAI.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff demands judgment against defendants as follows:

A.     Declaring this action to be a class action maintainable pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff to be a proper representative of the Class;

B.     On the claims for relief, awarding plaintiff and the other members of the Class damages in accordance with the federal securities laws in an amount to be determined at trial;

C.     Awarding plaintiff and the other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.    Awarding plaintiff and the members of the Class such other and further relief, including injunctive and equitable relief, as may be just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Date:    September 29, 2005

    s/Alfred G. Yates, Jr.
Alfred G. Yates, Jr. (PA Id. No. 17419)
Gerald L. Rutledge  (PA Id. No. 62027)
**LAW OFFICE OF ALFRED G. YATES, JR. PC**
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
Telephone: (412) 391-5164
Facsimile: (412) 471-1033

Patrick V. Dahlstrom
Leigh Handelman Smoller
**POMERANTZ HAUDEK BLOCK**
  **GROSSMAN & GROSS LLP**
One North LaSalle Street
Suite 2225
Chicago, Illinois 60602
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

Stanley M. Grossman
Marc I. Gross
Fei-Lu Qian
**POMERANTZ HAUDEK BLOCK**
  **GROSSMAN & GROSS LLP**
100 Park Avenue
26th Floor
New York, New York 10017
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

-32-

Eduard Korsinsky
**ZIMMERMAN, LEVI & KORSINSKY LLP**
39 Broadway
Suite 1601
New York, New York 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

**Attorneys for Plaintiff**

## CERTIFICATION OF NAMED PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAWS

Blumfield Investments duly certifies and says, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed the complaint and authorized its filing.

2.  I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.  I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  I engaged in the following transactions in the common stock of "World Health Alternatives, Inc. during the Class Period described in the Complaint:

| Date | Transaction | Shares | Price |
|------|-------------|--------|-------|
| 1/12/2005 | Purchase | 5,000 | $3.85 |
| 1/12/2005 | Purchase | 15,000 | $3.85 |
| 1/14/2005 | Purchase | 5,000 | $3.40 |
| 8/16/2005 | Purchase | 18,000 | $2.38 |
| 2/14/2005 | Sale | 5,000 | $3.42 |
| 6/24/2005 | Sale | 18,500 | $3.25 |
| 7/28/2005 | Sale | 1,500 | $3.53 |
| 8/19/2005 | Sale | 18,000 | $0.05407 |

5.  Within the last 3 years, I have not served as a class representative in any federal securities fraud case.

6.  I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating

to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct. Executed this 21st day of September 2005.

_____

BLUMFIELD INVESTMENTS